## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDER YOON, individually and on behalf of all other similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>BLOCKRATIZE, INC. d/b/a POLYMARKET, QCX LLC d/b/a POLYMARKET US, ADVENTURE ONE QSS, INC. d/b/a POLYMARKET, QC CLEARING, LLC. d/b/a POLYMARKET CLEARING, QC TECH LLC d/b/a PM US Tech, and DOES 1-20,<br><br>    Defendants. | Case No.  26-1160<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

1.      Plaintiff Alexander Yoon ("Plaintiff"), individually and on behalf of all those similarly situated, alleges the following based on his personal knowledge as to the facts pertaining to Plaintiff, and based on the investigation of counsel and information and belief as to all other allegations:

## I.    <u>INTRODUCTION</u>

2.      Defendants BLOCKRATIZE, INC., QCX LLC, and ADVENTURE ONE QSS, INC., QC CLEARING LLC, and QC TECH LLC (collectively, "Polymarket") operate an unlawful sports gambling platform (the "Platform," "Polymarket Platform," or "Gambling Website(s)") throughout the United States.

3.      Founded in 2020, Polymarket describes its Platform as the "Worlds Largest Prediction Market." In reality, it is an unlicensed sports betting enterprise. Polymarket markets itself as a prediction market, in pertinent part, to hide the fact that the platform provides for and facilitates illegal sports gambling.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

4.      In fact, while Polymarket purports to offer a legal derivatives exchange and prediction market ("market") across the U.S., in reality, its sale of event-based sports wagering contracts (including on the outcome of games, individual player metrics, team results, and sometimes even a combination of sport outcomes, i.e. parlays) violates the specific laws of over two dozen states that prohibit gambling or expressly allow for the recovery of gambling losses.[1]

5.      Throughout the class period, Polymarket has routinely marketed its Platform as safe, legal, and authorized to provide sports gambling in the United States. Not so.

6.      Based on Polymarket's false representations, Plaintiff and the Classes (as defined in Section VII, below) bargained for entry into legal derivatives exchange and prediction markets. But instead they received entry into illegal sports gambling contests. Plaintiff and the Classes did not receive the benefit of their bargain, as the illegal entries had substantially less (in fact zero) value than entry into legal contests. Moreover, if Polymarket had accurately disclosed the unlawful nature of the gambling services, Plaintiff and the Classes would not have used the Polymarket Platform's sports gambling services.

7.      Accordingly, Plaintiff brings this action against Polymarket seeking to recover the millions of dollars that Defendants have unlawfully taken from him and members of the Classes.

## II.    **PARTIES**

### A.    **Plaintiff.**

8.      At all times relevant to this action, Plaintiff Alexander Yoon was over the age of 18 and was a resident of Rancho Palos Verdes, California.

### B.    **Defendants.**

9.      BLOCKRATIZE, INC., d/b/a Polymarket, is incorporated in Delaware and headquartered in New York City, New York. Blockratize is the sole owner of QCX LLC, QC

---

[1] Alabama, Arkansas, Connecticut, District of Columbia, Florida, Georgia, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, New Hampshire, New Jersey, New Mexico, New York, Ohio, Oregon, South Carolina, South Dakota, Tennessee, Vermont, Virginia, Washington, West Virginia, and Wisconsin. Polymarket's practices also violate laws like California's criminal ban on "bets and wagers" pursuant to Penal Code Section 337a.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Clearing, LLC, and QC Tech LLC, and has operated Polymarket from New York since its creation in 2020. Blockratize is believed to conduct substantial business across the United States, including in this District, and to derive substantial revenue from those operations. On January 27, 2026, Blockratize filed a U.S. trademark application for Polymarket.[2]

10.     QCX LLC (d/b/a "Polymarket US"), QC Clearing LLC (d/b/a "Polymarket Clearing") (collectively "QCEX"), and QC Tech LLC (d/b/a "PM US Tech") comprise Blockratize's American event-based prediction market and clearinghouse, and each are incorporated in Delaware and headquartered in Boca Raton, Florida. QCEX was purchased by Defendant Blockratize in July 2025 for the purpose of restarting Blockratize's gambling operations in the United States.[3] QCEX is believed to conduct substantial business across the United States, including in this District, and to derive substantial revenue from those operations.

11.     ADVENTURE ONE QSS, INC., d/b/a Polymarket, is a foreign corporation existing and organized under the laws of Panama, with its headquarters and principal place of business at 1280 Lexington Avenue, Suite 1448, New York City, New York 10028. Defendant is a citizen of New York for purposes of diversity pursuant to 28 U.S.C. § 1332(d)(2). Defendant owns and/or operates Polymarket and conducts substantial business the United States, including in this District, to derive substantial revenue from those operations.

12.     Does 1-20 are individuals and/or entities who facilitate Defendant Polymarket's unlawful practices described in this Complaint. The identities of Does 1-20 are not presently known to Plaintiff. The Doe defendants, and the Polymarket entities, are collectively referred to in this Complaint as "Defendants" or "Polymarket." Plaintiff expressly reserves the right to amend this Complaint to add the Doe defendants by name, once their identities are known.

13.     Each Defendant is a "person" and/or engages in "business" and has transacted business within this District by offering, marketing, facilitating, and profiting from event-contract

---

[2] https://www.trademarkelite.com/trademark/trademark-detail/99617077/POLYMARKET?

[3] Ross, K., *Polymarket acquires QCEX for $112*, https://blockworks.co/news/polymarket-qcex-acquisition (last viewed Feb. 3, 2026)

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

products to consumers residing in and/or accessing the platforms within this state and across the country.

### III.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (i) Plaintiff is a citizen of a different state than Defendants, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action.

15.    This Court has personal jurisdiction over the Defendants because they maintain their principal place of business and operational headquarters in New York, New York, and because Defendants regularly conduct business within this District, including by engaging in the unlawful gambling practices that are at the center of this action. Defendants are considered "at home" in New York.

16.    Defendants purposefully availed themselves of the New York market by conducting business operations from this District, employing personnel here, directing platform operations from this District, and intentionally causing effects within and outside New York, including to Plaintiff. Further, Defendants intentionally target consumers in New York and nationwide, including Plaintiff.

17.    Defendants actively disseminate targeted marketing and advertisements within the state with the intent of promoting and selling its product and Platform to consumers in this District. As such, Defendants conduct business with sufficient minimum contacts in New York as to purposefully avail themselves to the New York market.

18.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(c) because Defendants' principal place of business is in this District and a substantial part of the unlawful actions giving rise to the claims occurred in this District.

### IV.    BACKGROUND

#### A.    Sports Betting Is Governed by State Law.

19.    Sports gambling is one of the most highly regulated industries in the United States.

20.     Until the Professional and Amateur Sports Protection Act ("PASPA," 28 U.S.C. §§ 3701 *et seq.*) was overturned in 2018, sports gambling was illegal in most of the United States. *See Murphy v. Nat'l Collegiate Athletic Ass'n¸* 584 U.S. 453 (2018). In its holding, the *Murphy* Court confirmed that states, not the federal government, may regulate sports betting.

21.     Since then, more than 40 states and territories have enacted legislative and regulatory schemes that both permit licensed sports betting and prohibit the operation of gambling enterprises that violate state regulations, such as by failing to register with the state.

22.     Moreover, many states that authorize sports betting allow gambling participants to seek recovery of their gambling losses. This cause of action traces its roots to a 1710 British law passed during the reign of Queen Anne (the "Statute of Anne"), which makes certain gambling debts unenforceable, allows a losing party to sue for the value of losses, and in certain jurisdictions, permits third parties to seek recovery for treble damages as a financial incentive to induce the public to investigate and pursue claims against gamblers.

**B.     New York, Where Polymarket's Operations Are Based, Regulates Sports Gambling Through Licensing Requirements, Prohibitions on Unlicensed Wagering, and Prohibiting Unfair and Deceptive Practices.**

23.     New York, where Polymarket's operations are based, is one such state.

24.     New York generally prohibits all gambling, with limited exceptions. *See* N.Y. Const. art. I, § 9; Gen. Oblig. L. § 5-401. This prohibition reflects the State's strong public policy against online gambling. *See Ramesar v. State*, 224 A.D.2d 757, 759 (1996) (noting New York's "[p]ublic policy continues to disfavor gambling").

25.     New York defines gambling as a person "stak[ing] or risk[ing] something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." N.Y. Penal Law § 225.00(2).[4] Both in person and virtual casinos are subject

_____

[4] New York defines "something of value" expansively to include "any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

to these laws. *See e.g.*, *People v. World Interactive Gaming Corp.*, 714 N.Y.S.2d 844, 846 (Sup. Ct. N.Y. Cty. 1999).[5]

26.    Moreover, legal gambling operations are governed by the New York Racing, Pari-Mutuel Wagering and Breeding Law. N.Y. PML §§ 100 *et seq.* Sports wagering is regulated in PML §§ 1367 and 1367-a. Section 1367(2)(a) of the PML provides that "[n]o entity shall administer, manage, or otherwise make available a mobile sports wagering platform to persons located in New York state unless licensed with the commission."[6]

27.    Other than wagering allowed under the PML through licensed entities, "[a]ll wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful." N.Y. Gen. Oblig. § 5-401.

28.    New York also maintains its version of the Statute of Anne, which enables a person who loses an unlawful wager or bet to recover the sums lost from the winner by suing the winner within three months. N.Y. Gen. Oblig. Law §§ 5-419, 5-421.

29.    New York also generally prohibits deceptive acts and practices, including false advertisements. *See* New York General Business Law §§ 349(a) ("[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are

---

directly or indirectly contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge." N.Y. Penal Law § 225.00(6).

[5] The Penal Law imposes no criminal liability on individual bettors, focusing instead on bookmakers and other operators, like Defendants, that profit from purported gambling activity. *See e.g.* N.Y.Penal Law § 225.10.

[6] New York defines "sports wagering" as betting or wagering "on sporting events or any portion thereof, or on the individual performance statistics of athletes participating in a sporting event, or any combination of sporting events, by any system or method of wagering, including, but not limited to, in-person communication and electronic communication through Internet websites accessed via a mobile device or computer, and mobile device applications; provided, however, that sports wagers shall include, but are not limited to, single-game bets, teaser bets, parlays, over-under bets, money line bets, pools, in-game wagering, in-play bets, proposition bets, and straight bets." PML § 1367(x).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

hereby declared unlawful") and 350 ("false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.").

30.    Defendants blatantly disregard New York's clear prohibition on unlicensed sports gambling by allowing users to place bets on the outcome of sports games, individual player statistics, team results, and/or a combination by risking or staking "something of value"—real-world currency.

31.    Moreover, Defendants engaged in deceptive acts and practices by offering their illegal sports gambling services in New York and falsely advertising those illegal gambling services as legal derivatives exchange and prediction markets.

### C.    California, Where Plaintiff Resides, Continues to Ban All Forms of Sports Betting.

32.    Many states continue to ban all forms of sports betting, including Alaska, California, Hawaii, Idaho, Nebraska, North Dakota, Oklahoma, Texas, and Utah. California, where Plaintiff resides, has flatly rejected and criminalizes sports betting.

### 1.    California's Longstanding Ban on Gambling.

33.    For over 150 years, California has broadly prohibited commercialized gambling.

34.    For example, in 1872, California enacted Penal Code Section 330, which provides in relevant part that "[e]very person who . . . conducts, either as owner or employee . . . *any banking or percentage game* played with . . . *any device*, for money, checks, credit, or other representative of value . . . is guilty of a misdemeanor." CAL. PENAL CODE § 330 (emphasis added).

35.    A "banking game" refers to a situation where the "house" is a participant in the game, taking on all contestants, paying all winners, and collecting from all losers. *See Sullivan v. Fox,* 189 Cal. App. 3d 673, 678 (1987). And a "percentage game" refers to a situation where the house collects a portion of the bets or wagers made by contestants but is not directly involved in game play. *See id. at* 679.

36.    Similarly, California Penal Code Section 337a prohibits additional conduct, including:

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

- "*Pool selling* or *bookmaking*, with or without writing, at *any time or place*." CAL. PENAL CODE § 337a(a)(1) (emphasis added).

- "*[R]eceiv[ing], hold[ing], or forward[ing]* . . . in *any manner whatsoever*, any *money . . . staked, pledged, bet or wagered*, or to be staked, pledged, bet or wagered, or offered for the purpose of being staked, pledged, bet or wagered, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of skill, speed or power of endurance of *person* or animal, or between *persons*, animals, or *mechanical apparatus*, or *upon the result, or purported result, of any* lot, chance, casualty, *unknown or contingent event whatsoever.*" *Id.* at (a)(3) (emphasis added).

- "[A]t *any time or place, record[ing], or register[ing] any bet* or bets, *wager* or wagers, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of *skill*, speed or power of endurance *of person* or animal, or *between persons*, animals, or *mechanical apparatus*, or upon the result, or purported result, *of any* lot, chance, casualty, *unknown or contingent event whatsoever.*" *Id.* at (a)(4) (emphasis added).

- "*[O]ffer[ing] or accept[ing] any bet* or bets, or *wager* or wagers, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of skill, speed or power of endurance *of person* or animal, or *between persons*, animals, or *mechanical apparatus*." *Id.* at (a)(6) (emphasis added).

37. The terms used in Section 337a have their commonsense meanings. For example, the California Court of Appeal has explained that "'[p]ool selling' is the selling or distribution of shares or chances in a wagering pool," such as when money wagered by all participants is combined into a single pool and the winnings are distributed based on predetermined rules. *See Finster v. Keller,* 18 Cal. App. 3d 836, 846 (1971) (cleaned up). And "'[b]ookmaking' is the making of a betting book and includes the taking of bets, [and] [t]he taking of one bet is sufficient" to constitute "bookmaking." *People v. Thompson*, 206 Cal. App. 2d 734, 739 (1962) (cleaned up).

38.    Similarly, "bet" and "wager" have their commonsense meanings. For example, the Judicial Council of California Criminal Jury Instructions (2025 Edition) provides that a "bet is a wager or agreement between two or more people that if an uncertain future event happens, the loser will pay money to the winner or give the winner something of value. A bet includes a wager made on the outcome of any actual or purported event, including but not limited to any kind of sporting contest."   CALCRIM No. 2993, Receiving or Holding Bets (CAL. PENAL CODE § 337a(a)(3)) (cleaned up).[7]

39.    "Bets" and "wagers" include entry fees paid in online fantasy sports. *Los Angeles Turf Club v. Horse Racing Labs, LLC,* 2017 WL 11634526, at *8 (C.D. Cal. May 15, 2017).

40.    Put simply, a company violates California Penal Code Section 337a when it engages in pool selling, bookmaking, or accepts or records any bets or wagers on the result of any contest and/or any unknown or contingent event whatsoever—including, without limitation, bets associated with the performance of persons.[8]

41.    Moreover, various sections of the California Penal Code prohibit "lotteries" and "games of chance."

42.    For example, Penal Code Sections 320 and 321 make the operation of a lottery unlawful: "Every person who contrives, prepares, sets up, proposes, or draws any lottery, is guilty of a misdemeanor"[9] and "[e]very person who sells, gives, or in any manner whatever, furnishes or transfers to or for any other person any ticket, chance, share, or interest, or any paper, certificate, or instrument purporting or understood to be or to represent any ticket, chance, share, or interest

---

[7] Available online at https://www.justia.com/criminal/docs/calcrim/2900/2993/ (last visited June 10, 2025).

[8] While Section 337a violations are reduced to infractions in certain circumstances for non-commercial gambling in amounts below $2,500, the Section 337a reductions expressly do "not apply to . . . [a]ny bet, bets, wager, wagers, or betting pool or pools made online." CAL. PENAL CODE § 336.9(b)(1).

[9] CAL. PENAL CODE § 320.

in, or depending upon the event of any lottery, is guilty of a misdemeanor."[10] Penal Code Section 319 defines a lottery broadly to include "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known." CAL. PENAL CODE § 319.

43.    Similarly, Penal Code Section 330a makes it unlawful to own or operate any "contrivance, appliance, or mechanical device, upon the result of action of which money or other valuable thing is staked or hazarded . . . [that] is won or lost . . . dependent upon hazard or chance." CAL. PENAL CODE § 330a.

44.    And Penal Code Section 337j makes it unlawful to operate a "game of chance" or to "receive, directly or indirectly, any compensation" for operating such a game "*without having first procured . . . all federal, state, and local licenses required by law*." CAL. PENAL CODE § 337j. (emphasis added).

45.    In fact, as the California legislature re-affirmed in 2008, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

**2.    Supermajorities of the California Electorate Rejected the Gambling Industry's Attempts to Legalize Sports Betting in 2022.**

46.    In 2022, two ballot initiatives were put to the California voters to legalize certain additional forms of gambling in the state, including various forms of sports betting: Proposition 26 and Proposition 27.

---

[10] CAL. PENAL CODE § 321.

47.    Proposition 26 was primarily sponsored by California's Native American tribes, and, among other things, would have:

- Legalized in-person sports betting at tribal casinos.

- Allowed additional gambling at tribal casinos, including roulette and dice games like craps.

- Established certain taxes and fees associated with sports betting.

48.    Proposition 26, however, was soundly rejected in November 2022, with approximately 67% of the California electorate voting "no."

49.    Proposition 27 aimed to legalize online sports betting in California, and was primarily sponsored by the online sports betting industry, with the Washington Post reporting that "the industry ultimately spent $150 million on political ads"[11] in an attempt to legalize online gambling in California.

50.    Among other things, Proposition 27 would have:

- Legalized and regulated online sports betting in California.

- Established a new division within the California Department of Justice to set license requirements and oversee the industry.

- Imposed a 10% tax on sports betting revenue and established licensing fees.

- Allocated revenue from online gambling to homelessness prevention.

51.    Proposition 27 was also soundly rejected in November 2022, with 82% of the electorate voting "no," making it one of the largest margins of defeat in California ballot proposition history.

---

[11] Gus Garcia-Roberts, *Inside the $400 million fight to control California sports betting,* WASH. POST (Nov. 3, 2022), https://www.washingtonpost.com/sports/2022/11/03/prop-26-27-california-sports-betting/ (last visited June 10, 2025).

      **3.**      **Since Nearly the Inception of Statehood, California Has Allowed for the Recovery of Gambling Losses through the Statute of Anne.**

52.     In 1710, the Parliament of the United Kingdom passed the Gaming Act of 1710 ("Gaming Act"). The Gaming Act did two important things. First, Section One of the Gaming Act voided and outlawed all contracts relating to gambling contracts to extend money or credit to those gambling and outlawed their recovery. Second, Section Two of the Gaming Act specifically allowed those who lost money gambling to bring suit for losses incurred within the prior three months from the winners of that money. Section Two of the Gaming Act—commonly referred to as the Statute of Anne—was carried over from the United Kingdom in many states in the form of gambling loss recovery statutes and other incorporations of English law into state law.

53.     California was one of those states.

54.     Specifically, in 1850, California enacted a statute that the "[t]he common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this State, is the rule of decision in all the courts of the state." That enactment remains the law of California, and is currently codified at Civil Code § 22.2.

55.     A recent binding decision of the Court of Appeal confirms that the Statute of Anne was carried over as part of Civil Code Section 22.2: "California imported not only the whole body of judge-made decisional law of the English courts, but also the written statutes enacted by Parliament. Among the enactments of Parliament adopted as California common law was the Statute of Anne, which declared all gambling debts utterly void, frustrate, and of none effect, to all intents and purposes whatsoever. (9 Anne, ch. 14, § 1.)" *Tak Chun Gaming Promotion Co. v. Long*, 96 Cal. App. 5th 1027, 1033 (2023) (cleaned up).

56.     Accordingly, in California, all gambling losses that exceed £10.00—approximately $13.64 at the exchange rate on January 24, 2026—are recoverable as a matter of right in California.

D.    **Over Thirty States Authorize the Recovery of Gambling Losses Through Statute of Anne Laws.**

57.    At least thirty other states and jurisdictions authorize the recovery of gambling losses through their respective versions of the Statute of Anne. The following section sets forth two categories: jurisdictions that (1) permit sports betting but allow the recovery of gambling losses and (2) jurisdictions that do not permit sports betting but still allow the recovery gambling losses.

1.    **Jurisdictions Where Gambling Is Legal, but Loss-Recovery Statutes Apply.**

58.    In addition to New York, the following jurisdictions permit gambling but maintain statutes allowing recovery of gambling losses or voiding of wagers, or permit recovery of gambling losses when gambling was not lawful or otherwise authorized where legal gambling could be lawful or could otherwise be authorized: Arkansas (Ark. Code Ann. § 16-118-103), Connecticut (Conn. Gen. Stat. §§ 52-553, 52-554), the District of Columbia (D.C. Code § 16-702), Florida (Fla. Stat. §§ 849.12, 849.26, 849.29), Illinois (720 Ill. Comp. Stat. 5/28-8), Indiana (Ind. Code § 34-16-1), Kentucky (Ky. Rev. Stat. Ann. §§ 372.020, 372.040), Maryland (Md. Code Ann., Crim. Law § 12-110), Massachusetts (Mass. Gen. Laws ch. 137, § 1), Michigan (Mich. Comp. Laws §§ 730.315(1), 600.2939(1)), New Hampshire (N.H. Rev. Stat. Ann. § 338:3), New Jersey (N.J. Stat. Ann. §§ 2A:40-5, -6), Ohio (Ohio Rev. Code Ann. § 3763.02), Tennessee (Tenn. Code Ann. § 28-3-106), Vermont (9 Vt. Stat. § 3981), Virginia (Va. Code Ann. §11-15), and West Virginia (W. Va. Code § 55-9-2).

2.    **Jurisdictions Where Gambling Is Illegal and Loss-Recovery Statutes Apply.**

59.    Gambling remains unlawful in the following jurisdictions, where consumers may still seek recovery for gambling losses: Alabama (Ala. Code § 8-1-150), California (CAL. PENAL CODE §§ 319, 330a, 337j), Georgia (O.C.G.A. § 13-8-3(b)), Minnesota (Minn. Stat. § 541.02), Mississippi (Miss. Code Ann. § 87-1-5), Missouri (Mo. Rev. Stat. § 434.030 et seq.), Montana

(Mont. Code Ann. §§ 23-5-131, 23-5-151), New Mexico (N.M. Stat. Ann. § 44-5-1), Oregon (Or. Rev. Stat. § 30.74), South Carolina (S.C. Code Ann. § 32-1-10), South Dakota (S.D. Codified Laws § 21-6-1), Washington (Wash. Rev. Code § 4.24.070), and Wisconsin (Wis. Stat. § 945.10(4)).

## V.    FACTS COMMON TO THE CLASSES

### A.    The Proliferation of Online Gambling Is a $230 Billion Epidemic.[12]

60.    Fueled by the proliferation of online casinos and sports betting platforms following *Murphy*, gambling addiction in the United State has become a public health crisis.[13] For example, between 2019 and 2021, the National Council on Problem Gambling (NCPG) estimated that the risk of gambling addiction grew by 30%, and noted a 45% rise in contacts to the National Problem Gambling Helpline between 2021 and 2022.[14]

61.    Moreover, between 2018 and 2024, gambling addiction related internet searches increased exponentially, with as many as 180,000 searches during certain months—corresponding to approximately 6.5-7.3 million searches during that period.[15] In New York, specifically, the demand for "gambling addiction help" has increased by approximately 37%.

62.    To make matters even worse, a recent nationwide study found that 36% of boys aged "11-17 gambled in the past year, with 60% seeing gambling ads on social media."[16]

63.    It is well understood that gambling involves serious public health risks that may harm a gambler's economic, emotional, and physical well-being, as well as the well-being of their

---

[12] https://www.youtube.com/watch?v=7hUk4t9eGdA (last watched Feb. 5, 2026).

[13]    https://today.ucsd.edu/story/study-reveals-surve-in-gambling-adiction-following-legalization-of-sports-betting? (last accessed Feb. 5, 2026).

[14]    https://www.ncpgambling.org/news/ncpg-statement-on-the-betting-on-our-future-act/    (last accessed February 5, 2026).

[15] https://today.ucsd.edu/story/study-reveals-surge-in-gambling0

[16] https://www.youtube.com/watch?v=RcctA0nGItM (last watched Feb. 5, 2026)

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

families and communities. Studies show that legalized sporting gambling, and especially online sports gambling, harms individuals, families, and communities.

64.    The American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM 5-TR") categorizes gambling disorder as an "addictive disorder," making it the only defined behavioral addiction in that manual. The disorder includes symptoms such as an increased tolerance for gambling (*i.e.,* more money wagered over time); repeated unsuccessful efforts to control, reduce, or stop gambling; and lying or concealing the extent of gambling involvement.

65.    A review of sports wagering and gambling addiction studies conducted by the National Council on Problem Gambling shows that "[t]he rate of gambling problems among sports bettors is at least twice as high as among gamblers in general. . . [and] the rate of problems is even higher" when sports wagering takes place online, "with one study of online sports gamblers indicating that 16% met clinical criteria for gambling disorder and another 13% showed some signs of gambling problems.[17]

66.    "[N]ot only does sports betting lead to increased betting activity, but it also leads to higher credit card balances, reduced available credit, decreased net investments in financial markets, and greater participation in lottery play. These effects are particularly pronounced among financially constrained households."[18]

67.    Research further shows that "legalized sports betting amplifies emotional cues, as evidenced by increased [intimate partner violence] when a fan's home team unexpectedly loses."[19]

---

[17] A Review of Sports Wagering & Gambling Addiction Studies Executive Summary, NAT'L COUNCIL ON PROBLEM GAMBLING, https://www.ncpgambling.org/wp-content/uploads/2023/09/Sports-gambling_NCPGLitRvwExecSummary.pdf (last visited Sept. 22, 2025).

[18] Scott R. Baker et al., Gambling Away Stability: Sports Betting's Impact on Vulnerable Households, Oct. 21, 2024, https://mitsloan.mit.edu/sites/default/files/inline-files/Session3_Paper3_Gambling%20Away%20Stability.pdf.

[19] Kyutaro Matsuzawa & Emily Arnesen, Sports Betting Legalization Amplifies Emotional Cues & Intimate Partner Violence (Oct. 30, 2024) available at https://ssrn.com/abstract=4938642 or http://dx.doi.org/10.2139/ssrn.4938642.

The same study found that when compared to non-gambling states, states that allowed sports gambling saw the average consumers' credit scores drop by a statistically significant number while bankruptcies increased 25-30% and debt transferred to debt collectors climbed 8%.[20] Notably, states that allowed online gambling saw close to three times the decline in credit scores than states that allowed gambling, but not online. Auto loan delinquencies and use of debt consolidation loans also increased.

68.    Several US studies report that those with gambling disorder had the highest suicide rate of any addiction disorder, with one in five having attempted suicide.

69.    In addition, experts suggest that the pressures that sports betting puts on college athletes may be a contributing factor to the rise in suicidality for this group.

70.    Despite these harms, online gambling companies exploit vulnerable consumers through "[s]ystems of rewards and punishments in online gambling products [that] are designed to encourage continued use and attention, additional payments, or other behaviors that are not always beneficial to the user[.]"[21] This often takes the form of push notifications to users' phones or promotions such as "free" bets or sweepstakes entries or limited time increased payments to encourage users to continue to gamble.

71.    While tragic, this surge in problem and youth gambling is unsurprising; Americans in every state are bombarded every day by new and often-times unlawful online sports-gambling platforms, like Polymarket, which operate without any regulatory oversight.

---

[20] Baker, et al, *supra* n. 18 at 11–14.

[21] Gainsbury, *et al.*, *Reducing Internet Gambling Harms Using Behavioral Science: A Stakeholder Framework.* Front. Psychiatry 11:598589 (2020) (noting that mobile gaming companies' tactics, driven by sophisticated machine learning models, are highly effective at capturing attention but may also exploit individuals with addictive tendencies by encouraging continued or escalated gambling. The authors advise that these targeted mechanisms must be carefully managed and regulated, as they pose a substantial risk when not balanced with protective measures).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**B.    Polymarket's Expansion into Sports Betting & Gambling Operations.**

**1.    Overview of Polymarket.**

72.    Polymarket is a private technology company that runs a web-based "prediction" trade-based platform. In reality, the platform is an unlawful sports betting platform.

73.    Specifically, Polymarket enables consumers to place bets, which it calls "shares" or "event contracts,"[22] through its website, https://Polymarket.com, and mobile application offered on Android and iOS (Apple platforms).

74.    Polymarket offers binary event contracts that pay out based on whether a specified future event occurred (Yes or No), where consumers place wagers on the results of future sporting events, player stats, or propositions. By their very nature, these contests can only result in one of two outcomes (Yes—event occurred; No—event did not occur).

75.    Polymarket's "event contracts" function the same as traditional sports-betting wagers. In this way, Polymarket's use of the term "event contract" is merely an attempt to disguise its provision of unlawful sports betting.

76.    Polymarket offers so-called event contracts in the following way:

a.    First, users "Pick a Polymarket," and choose whether to buy shares of the "'Yes' or 'No'" outcome associated with that contest. According to Polymarket, "buying shares is like betting on the outcome. Odds shift in real time as other traders bet."



# 1. Pick a Polymarket

Buy 'Yes' or 'No' shares depending on your prediction.
Buying shares is like betting on the outcome. Odds shift
in real time as other traders bet.

**Next**

---

[22] *See* 7. U.S.C. § 7a-2(c)(45)(C)(i) (defining "Event Contracts" as "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency [] other than a change in the price, rate, value or levels of a commodity").

b.      Next, to "Place a Bet," the user must fund their account with "crypto, credit/debit card, or bank transfer". Polymarket notes there are "[n]o bet limits."

## 2. Place a Bet

Fund your account with crypto, credit/debit card, or bank transfer—then you're ready to bet. No bet limits and no fees.

Next

c.      Then, once that bet has been placed, users can sell their Yes or No "shares" at any time, or wait until the market ends to redeem winning shares for $1 each."

77.     In addition to collecting the value of incorrect bets placed, Polymarket makes money by raking in a fee on each transaction made on the platform.

78.     Bettors deposit funds into their Polymarket account and use those funds to place bets. Any return on a successful wager will remain in the bettor's Polymarket account until they choose to withdraw. Polymarket charges a fee for certain deposit and withdrawal methods.

79.     Polymarket matches bettors on opposite sides of the event contract (the "yes" and the "no") so that the combined wager from both bettors equals $1.

## 3. Profit 🤑

Sell your 'Yes' or 'No' shares at any time, or wait until the market ends to redeem winning shares for $1 each. Create an account and place your first trade in minutes.

Get Started

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

80.     If the price changes, bettors may "sell" their wager to other bettors before the event takes place.

## 2.     Polymarket's Evolution in the United States.

81.      When Polymarket initially launched in 2020, users located in the United States were able to access and trade on Polymarket. At the time, Polymarket did not register with the Commodity Futures Trading Commission (CFTC) as a Designated Contract Market (DCM) or Swap Execution Facility (SEF).

82.     Accordingly, on January 3, 2022, the CFTC issued an enforcement order against Blockratize, Inc., d/b/a Polymarket. The CFTC's enforcement order found that Polymarket's event contracts constituted swaps under the Commodity Exchange Act.

83.      In connection with the January 3, 2022 CFTC order, Polymarket agreed to pay a $1.4 million civil monetary penalty, wind down all non-compliant markets, including the United States, ceasing to offer any event contracts to United States-based users, and implement geo-blocking for United States-based users going forward.

84.     Although Polymarket was effectively banned in the United States, it continued to grow internationally. Polymarket became the world's largest prediction market by volume.

85.     Meanwhile, Polymarket indicated their intention re-enter the United States market in early 2025.

86.     In July 2025, Polymarket paid $112 million to acquire QCX LLC and QC Clearing, a Florida-based derivatives exchange and clearinghouse licensed by the CFTC.

87.     In October 2025, Intercontinental Exchange (ICE) announced an investment of $2 billion in Polymarket, valuing the company at between $8 billion and $9 billion.

88.     On November 25, 2025, the CFTC issued an Amended Order of Designation, purporting to authorize Polymarket through QCX to trade as a Futures Commission Merchant (FCM).

89.     On November 12, 2025, Polymarket offered a limited beta launch for U.S. users.

90.     On December 3, 2025, Polymarket launched a public U.S. based iOS application.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

91.    Since December 3, 2025, Polymarket has sold sports-based gambling services to consumers located throughout the United States on its Polymarket Platform.

**C.    Polymarket's Platform Enables Sports Gambling.**

92.    As part of its relaunch into the U.S. in December 2025, Polymarket has deliberately restructured its platform to enable illegal sports betting disguised as "event contracts."

93.    Indeed, Polymarket openly marketed to consumers that they could bet (or "trade") on "Every Football Game In All 50 States" on the Polymarket Platform:



94.    And while Polymarket's founder, Shayne Coplan, has claimed that sports betting on the Platform is "similar to [buying] a stock, but it's not a stock," Defendants' Instagram account



CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

publicly touts—on the Polymarket Sports Instagram page—that the Platform offers "the most accurate sports *odds* in the world":

95.     Regardless of Defendants' self-serving characterization of the Platform, it is nearly indistinguishable from a traditional online sports betting website:



*Screenshots taken from the Polymarket Platform (linked through the Polymarket Sports Instagram Profile) on February 5, 2026*

96.     Polymarket employs classic sports-betting categories: money line winner markets, spreads, totals, props and parlays. These terms do not exist independent of the sports betting industry and relate to nothing except variations of ways to hedge or bet risk on sporting events, pending the outcome of entirely independent events that relate to nothing paid or exchanged in

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

return for monetary value. Indeed, Polymarket "shares" and "event contracts" for sports wagers constitute gambling.

97.    Polymarket's Platform is designed to encourage high-risk transactions by emphasizing reward while obscuring risk.

98.    These features directly incentivize repeated transactions by gamifying participation and encouraging rapid and repeated wagering, mirroring the behavioral hooks commonly used by digital gambling platforms. In fact, the volume of sports wagers on Polymarket's platform vastly exceeds those placed by users on other event types, with sports wagering achieving the highest platform velocity of all sectors offered on the Platform.[23]

99.    To further spur gambler engagement, Polymarket offers a continuously updating ticker tape of market activity, a "people are also buying" feed on its event contract wager page seen by gamblers before placing a wager, and a "people also bought" prompt shown immediately after users place a wager. Each of these features sustains gamblers' real-time stimulation and encourages the gambler to immediately place another wager without pause. These features mirror known psychological triggers of gambling behavior and are engineered to increase user retention and transaction volume.

100.    This uninterrupted sequence of feedback and engagement contributes to a reward loop commonly associated with addictive gambling behavior. Behavioral researchers warn that such mechanisms, modeled after operant conditioning and slot machine dynamics, can bypass rational evaluation and contribute to excessive financial risk-taking.

101.    Polymarket also utilizes competitive and social comparison metrics to encourage betting, including public leaderboards to rank its bettors based on profits and volume on a daily, weekly, monthly, and all-time basis. The leaderboards serve no market purpose; instead, they promote repeated high-risk behavior by rewarding speculative successes with community recognition.

---

[23] https://polymarketanalytics/com/research/polymarket-velocity (last accessed Feb. 5, 2026)

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

102.    The leaderboard rankings, displayed with usernames, avatars, and performance stats, mimic leaderboards utilized in video games and other platforms such as fantasy contests and social casinos, and encourage users to chase short-term gains.

103.    There is also a countdown clock in the top right corner appearing in blue that reflects the remaining time for the time-limited leaderboards, as well as a button to "Join" either the profit or volume leaderboards, respectively. These features only serve to instill further incentive and pressure for users to appear on the leaderboard.

104.    User profiles serve as performance dashboards that encourage bettors to compete, compare, and signal success. The interface reinforces speculative behavior through design choices modeled on gambling platforms, including rapid trade cycling, reward anticipation, and mechanisms known to trigger compulsive engagement loops.

### 3.    Polymarket Claims Its Sports Betting Is Legal Nationwide.

105.    Polymarket advertises its sports gambling products nationally, through its website and mobile application, in addition to advertising on streaming online content, television, and social media advertisement.

106.    When Polymarket was preparing to relaunch in the United States, its marketing materials included taglines such as "BREAKING: Legal football trading is coming to ALL 50 states this fall".[24] As part of its marketing push, Polymarket purchased nearly $1,000,000 in Meta advertisements.

107.    Moreover, Polymarket regularly purchases advertisements on Meta platforms, including Facebook and Instagram, to specifically target states that have not legalized sports betting, including California and Texas.

---

[24]    https://www.sportico.com/business/sports-betting/2025/polymarket-nfl-sports-prediction-market-1234867823/

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

108.    Polymarket's advertisements are disseminated through website and app store placements, social media platforms like Instagram and TikTok, and other forms of advertising directed to California residents.

109.    In addition to California and Texas, where sports gambling remains illegal, Polymarket targeted other states where sports gambling is illegal by reposting text messages promoting the legality of sports betting, including but not limited to Georgia, Minnesota, and Washington.[25]

110.    Polymarket made these false statements even though unlicensed sports wagering is prohibited in every state, and sportsbook operating that is licensed is heavily regulated at the state level when permitted. Yet, in many of its marketing materials, Polymarket admits it offers gambling services.

111.    For example, in the United States, Polymarket Sports sponsored an advertisement on Meta, which started running January 30, 2026, stating "You've seen the takes. Now you can trade them legally in all 50 states. Download Polymarket now."[26]



[25]     https://casinobeats.com/2025/08/22/polymarket-ads-target-states-with-no-sports-betting-signal-u-s-relaunch-for-football-season/

[26]https://www.facebook.com/ads/library/?active_status=active&ad_type=all&country=US&is_targeted_country=false&media_type=all&q=polymarket&search_type=keyword_unordered&sort_

112.    In another advertisement run on Meta, Polymarket stated "Trade sports live like stocks. No house edge, lowest fees, and legal in every state. Download today for a $10 bonus – no deposit required."[27]



113.    Polymarket's Instagram advertisements evidence Polymarket's strategy to operate and market like a gambling entity rather than a risk prediction market. Polymarket has adopted this strategy, despite its knowledge that it has not registered to offer gambling services in the states where those services are legal and the fact that it intentionally targets states where gambling remains illegal.

---

data[mode]=total_impressions&sort_data[direction]=desc

[27]https://www.facebook.com/ads/library/?active_status=active&ad_type=all&country=US&is_ta rgeted_country=false&media_type=all&q=polymarket&search_type=keyword_unordered&sort_ data[mode]=total_impressions&sort_data[direction]=desc

      **4.**      **Once Potential Customers Arrive on the Polymarket Gambling Websites, They Are Repeatedly Assured that Polymarket Is Operating Legally.**

114.    On its website, Polymarket repeatedly assures prospective and existing customers that sports betting is now legal in all 50 states.

115.    In December 2025, Polymarket began claiming that "Polymarket operates globally through separate legal entities. Polymarket US is operated by QCX LLC, d/b/a Polymarket US, a CFTC regulated Designated Contract Market. This international platform is not regulated by the CFTC and operates independently."

116.    Polymarket's registration with the Commodity Futures Trading Commission does not authorize it to offer legal sports gambling to its customers in all fifty states. Polymarket's promises to consumers that its sports gambling is legal are misleading.

117.    Polymarket also misleads consumers by linking to the August 26th, 2025 Terms of Use Policies, which explicitly exclude US users, for example:

> USE OF THE SITE, PLATFORM OR TECHNOLOGY FEATURES FOR TRADING IS NOT PERMITTED BY PERSONS OR ENTITIES WHO RESIDE IN, ARE LOCATED IN, ARE INCORPORATED IN, HAVE A REGISTERED OFFICE IN, OR HAVE THEIR PRINCIPAL PLACE OF BUSINESS IN THE UNITED STATES OF AMERICA.[28]

118.    Buried within Polymarket's website, which is only accessible through research analysis, is the "POLYMARKET APP – TERMS & CONDITIONS (ISV FRONT END)", which appears to apply between US Polymarket users and PM US Tech (a/k/a QC Tech Limited Liability Company).[29]

---

[28] https://polymarket.com/tos

[29] https://polymarket.us/tos

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

119.    Once potential customers of Polymarket's gambling services reach Polymarket's Application download page, Polymarket incorrectly states that Polymarket "is now fully legal in the United States – in all 50 states".

With over 30 million users globally, Americans can now trade on the World's Largest Prediction Market™

On Polymarket, you can buy in and trade out without ever getting locked out.

Polymarket always has the tightest spreads, the lowest fees, & the biggest opportunities.

LIVE SPORTS TRADING
- Live trading in game
- Instantaneously trade in and out
- Bigger payouts than sportsbooks
- No "house" & no limits

TRADE ON ANYTHING
- COMING SOON: Geopolitics, election, news, tech, & culture polymarkets
- Put your money where your mouth is, and earn a return for your knowledge

HOW DOES IT WORK?
- Prices = probability
- If something has a 67% chance of happening, you can buy shares for $0.67 each which you can sell if the price goes up — or cash in for $1 each if you're right
- If you think the odds are wrong, you can profit by buying shares in the polymarket

LEGAL & REGULATED
- Polymarket is now fully legal in the United States — in all 50 states
- Backed by the New York Stock Exchange's parent company
- Bank-grade security & encryption
- 24/7 live customer support

Join the tens of millions of Polymarket users & see why there's been over $27 billion traded globally.

You see the future — now trade it.

### 5.    Polymarket Fails to Prevent Gambling Abuse.

120.    Polymarket provides no safeguards to prevent widespread addiction, financial ruin or risk of loss, or provide education to users that supposed "event contracts" constitute a form of highly addictive gambling.

121.    Polymarket allows anyone to open an account and start placing bets, after entering basic personal information, so long as the individual is at least 18 years old and can provide a single verifying document.

122.    Polymarket also did not uniformly implement robust geolocation/age-verification, self-exclusion, or helpline placements required of licensed operators.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

123.    Additionally, Polymarket's risk warnings were hard to locate behind continuously updating home-page content.

124.    Polymarket does not provide any resources or information to a bettor who is seeking responsible gambling messaging or help for financial loss or gambling addiction.

125.    Even if a bettor voluntarily self-excludes from Polymarket, there is no indication whether that bettor would automatically be removed from all Polymarket marketing lists.

### D.    Polymarket's Gambling Website Unlawfully Enables Gambling in New York.

126.    Despite being headquartered in New York, operating from New York, and offering sports betting from and within New York, Polymarket has not registered with the New York Gaming Commission. The Commission's website lists the entities that have registered, and Polymarket is not among them.[30]

127.    Given Polymarket has not obtained a license, Polymarket has not completed numerous steps New York requires sports betting platforms to complete prior to authorization and fails to be regulated by the New York Commission.  For example, New York requires sports betting mobile platforms to pay a one-time fee, adopt appropriate safeguards to ensure that authorized sports betters are physically located within the state when engaging in mobile sports wagering, and prohibits minors from participating. *See* PML §§ 1367-a(2)(a), 1367-a(2)(b), 1367-a(3), 1367-a(4)(a)(ii), 1367(1)(a).

---

[30] http://gaming.ny.gov/sports-wagering. (last visited Feb. 6, 2026)

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

128.    Moreover, Defendants' illegal sportsbook actively undermines critical consumer protections required by New York law. For example, Defendants allow anyone over the age of 18 to gamble on their platform, in complete disregard for the laws prohibiting individuals under 21 to gamble in New York.[31] Moreover, New York law prohibits sports betting in New York on in-state college sports teams. Yet, those exact wagers are found on Defendants' Platform:



129.    Moreover, on February 2, 2026, New York Attorney General Letitia James issued a "consumer alert warning New Yorkers of the risks posed by prediction markets," emphasizing that "these platforms operate without consumer protection and without the supervision of the New York Gaming Commission, putting New Yorkers at significant financial risk."[32] According to AG James, "***It's crystal clear: so-called prediction markets do not have the same consumer***

---

[31] *See e.g.*, N.Y. COMP. CODES R. & REGS. TIT. 9, § 5313.2(b) ("A gaming facility licensee shall post signs that include a statement that is similar to the following: . . . it is unlawful for any individual under 21 years of age to wager, paly or attempt to play a slot machine or table game."); § 5329.19(a) ("No person under 21 years of age may place a wager with a casino sports wagering licensee").

[32] *Consumer Alert and Industry Alert: Attorney General James Warns New Yorkers of Potential Harms of Sports Betting and Prediction Markets*, https://ag.ny.gov/press-release/2026/consumer-alert-and-industry-alert-attorney-general-james-warns-new-yorkers, Feb. 2, 2026.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

*protections as regulated platforms*," and "*operate as unregulated gambling without the basic protections New York Consumers both deserve and expect*," such as "allocating resources to develop and fund programs to combat problem gambling, implementing procedures to prevent underage gambling, enforcing restrictions to prevent predatory or deceptive advertising, utilizing procedures to identify customers battling a gambling addiction, creating guardrails to allow consumers to exclude themselves from the platform, and upholding prohibitions against insider betting and requiring regulatory review to ensure the financial stability and integrity of gambling operators."[33]

130.    Thus, Polymarket's gambling platform is unlawful under New York law because Polymarket enables users to place wagers and bets on sporting events, and the games are by chance and unknown or contingent events that are independent of the action of placing the wagers and bets. *See* New York Consolidated Laws, General Obligations Law Section 5-401 ("Illegal wagers, bets and stakes", "[a]ll wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful." ; Section 5-411 ("Contracts on account of money or property wagered, bet or staked are void"), "[a]ll contracts for or on account of any money or property, or thing in action wagered, bet or staked, as provided in section 5-401, shall be void."

131.    Under New York's version of the Statute of Anne, Plaintiff and the Proposed Class may "sue for and recover the money or value" of the money lost to Polymarket for sports betting within three calendar months prior to the filing of a lawsuit. *See* New York Consolidated Laws, General Obligations Law Section 5-419 ("Property staked may be recovered"), "[a]ny person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by

---

[33] *Id.*

such stakeholder or not, and whether any such wager be lost or not."; Section 5-421 ("Losers of certain sums may recover them"), "[e]very person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof."

E.     **Polymarket's Gambling Website Unlawfully Enables Sports Wagering in California.**

132.    Polymarket makes its contract wagers freely accessible to the public in the United States through its website and its mobile apps, including in California.

133.    Polymarket does not even attempt to reconcile its Polymarket Platform with California's ban on sports wagering.

134.    Despite Polymarket calling its services "shares" and "event contracts," in fact and substance consumers are placing wagers on the outcome of sporting events by using the Polymarket Platform.

135.    Polymarket's sporting event contracts and shares constitute unlawful gaming because Polymarket "deals, plays, or carries on, opens, or causes to be opened" and "conducts, either as owner or employee" and acts by taking a "bank or percentage", and allowing individuals to play or bet, in violation of California Penal Code Section 330.

136.    Polymarket's offering meets the definition of a "wager" under Section 337 because a user risks a sum of money (i.e. the price of the contract) on an uncertain occurrence in a sporting event (i.e. the position taken on the event contract) for the chance to win money if the event takes place (i.e. a prize). CAL. PENAL CODE § 337a(a)(4).

137.    Polymarket's sporting event contracts concern "a contest" by which Polymarket offers a bet or wager, related to "skill, speed or power of endurance of [a] person", or, "between persons…or mechanical apparatus." CAL. PENAL CODE § 337a(a)(6).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

138.    Accordingly, Polymarket's sport events contracts are wagers on uncertain outcomes, structured and operated in a manner that meets the legal definition of sports wagering under California law.

139.    For example, one of Polymarket's offerings display a binary option of a winner of a contest, the perceived likelihood of either option winning, and a price on either option determined by that perceived likelihood.  Polymarket pays out to the winner and nothing to the loser.

140.    Such bets are moneyline wagers, which is "a wager or agreement between two or more people that if an uncertain future event happens, the loser will pay money to the winner or give the winner something of value. A bet includes a wager made on the outcome of any actual or purported event, including but not limited to any kind of sporting contest."  CALCRIM No. 2993, Receiving or Holding Bets (CAL. PENAL CODE § 337a(a)(3)) (cleaned up).

141.    Moreover, Polymarket's wagering structure, including the ability to sell wagers to other users and the matching of buyers on opposite sides of a contract constitutes "exchange wagering." Exchange wagering allows bettors to bet or trade against one another rather than a "house".

142.    In addition, Polymarket offers the ability to wager on sporting events while those events are taking place.

143.    Put simply, the outcomes of the contests are contingent and unknown at the time the bets and wagers are collected and recorded (i.e., booked) by Polymarket. And as a result, Polymarket's contests violate California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j.[34]

---

[34] In the alternative, Plaintiffs allege that the gambling contests offered in California by Polymarket constitute games of "chance' for purposes of those Penal Code Sections that prohibit lotteries and/or other games of chance, and constitute games of skill, to the extent skill is found to be a necessary element of certain claims made under Penal Code Section 337a or otherwise.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**F.      Polymarket Fails to Warn Consumers of Ongoing Legal Challenges to Its Sports Betting Operations**

144.    As previously referenced, Polymarket is purportedly regulated by the Commodity Futures Trading Commission (CFTC), but fails to adequately warn consumers that Polymarket is facing numerous legal challenges to their offering of sports wagering bets online.

145.    Multiple state regulators have taken the position that Polymarket's sports-event contracts constitute unlicensed sports wagering, issuing cease-and-desist directives in several jurisdictions. And that is likely to increase with time; State Attorney Generals and gaming commissions in Arizona, Illinois, Maryland, Montana, Nevada, New Jersey, and Ohio have sent letters to Polymarket's biggest competitor, Kalshi, ordering it to cease and desist its illegal sports betting platform.[35]

146.    Moreover, in response to the Nevada Gaming Control Board's Complaint against Defendants,[36] a Nevada state-court judge granted a temporary restraining order on February 2, 2025, prohibiting Polymarket from operating in the state.[37]

147.    And while this increased regulatory pressure is of no surprise, it is necessary; "the average prediction market user loses twice as much of ever dollar they bet, compared to users of traditional sportsbooks."[38]

**G.      No Adequate Remedy at Law.**

148.    Plaintiff and the Classes have suffered an injury in fact resulting in the loss of money and/or property as a proximate result of Defendants' violation of law and wrongful conduct

---

[35] *AG Campbell Sues Online Prediction Market for Illegal and Unsafe Sports Wagering Operations*, Office of the Attorney General, https://www.mass.gov/news/ag-campbell-sues-online-prediction-market-for-illegal-and-unsafe-sports-wagering-operations (last visited Feb. 5, 2026).

[36] https://www.gaming.nv.gov/siteassets/content/about/press-release/ngcb-vs.-polymarket---complaint.pdf

[37] https://frontofficesports.com/polymarket-nevada-court-order-ban/ (last visited Feb. 2, 2026)

[38] https://x.com/JonathanDCohen1/status/2019059550859493656?s=20 (last visited Feb. 4, 2026)

alleged herein, and they lack an adequate remedy at law to address the unfair conduct at issue. Legal remedies available to Plaintiff and class members are inadequate because they are not equally prompt and certain and in other ways as efficient as equitable relief. Damages are not as equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. As such, the Court may award restitution even if it determines that Plaintiffs fail to sufficiently adduce evidence to support an award of damages. Further, damages and restitution are not the same amount. Unlike damages, restitution is not limited to the amount of money Defendants wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the original funds have grown far greater than the legal rate of interest would recognize. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

149.    Equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his use of the Polymarket Platform is determined to be an amount less than paid to use the Polymarket Platform. Without compensation for the full amount paid, Plaintiff would be left without the remedy he is entitled in equity.

**H.    Polymarket Acted with Malice, Oppression, and Fraud.**

150.    As detailed in this Complaint, Polymarket has acted with malice, oppression, and fraud.

151.    Polymarket acted with malice because, among other reasons and as otherwise detailed in this Complaint, Polymarket's conduct was despicable and was done with a willful and knowing disregard of the rights of the public, Plaintiff, and the Class (as defined below) because Polymarket knew (or should have known) that its gambling operations in California were illegal, but despite that induced Plaintiff and the Class to gamble and lose money through its platform while in California. As the California legislature has repeatedly made clear, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

152.    Polymarket's conduct was oppressive because, among other reasons and as otherwise detailed in this Complaint, it was despicable and subjected Plaintiff and the Class to cruel and unjust hardship in knowing disregard of their rights, including by falsely inducing them to lose significant sums of money through the illegal gambling enterprise that Polymarket held out as being legal in California.

153.    Polymarket's conduct was fraudulent because, among other reasons and as otherwise detailed in this Complaint, Polymarket intentionally misrepresented and concealed the true nature of its unlawful gambling enterprise from Plaintiff and the Class by affirmatively representing that the Gambling Website and associated contests were legal when Polymarket knew (or should have known) that such contests were not.

## VI.    NAMED PLAINTIFF'S FACTS

154.    At all times relevant to this action, including at all times since creating an account with Polymarket, Plaintiff Yoon has resided in Rancho Palos Verdes, California.

155.    On or about December 15, 2024, in response to advertisements in a word search app on his phone, Plaintiff created a Polymarket account in California. Polymarket represented to Plaintiff that the products and services it offered in California were legal.

156.    Since that time, Polymarket has continued to represent to Plaintiff, including on the Polymarket Platform, that its services are legal in California.

157.    In setting up and using his Polymarket account, Plaintiff expressly relied upon Polymarket's representations that the services it provides in California are legal.

158.    If Polymarket had honestly and accurately disclosed the unlawful nature of its gambling operations in California, Plaintiff would not have created an account with Polymarket in California and would not have placed bets while in California through Polymarket's gambling website.

159.    From approximately December 15, 2025 to January 14, 2026, Plaintiff deposited and lost approximately $5,000 on Polymarket while in California. Plaintiff also lost an additional

$5,000 in prior winnings, which he was unable to withdraw due to issues with the Polymarket Platform.

160.    Plaintiff has not used the Polymarket Platform since on or around January 14, 2026.

161.    If Polymarket had not solicited bets and wagers from Plaintiff while representing that such activities were legal (when, unknown to Plaintiff at the time, they in fact were not legal), he would not have made any of those bets or wagers and would not have paid any money to Polymarket.

162.    In Plaintiff's experience, Polymarket serves as the "house," setting the betting lines, taking bets and wagers from all users, documenting (i.e., "booking") those bets, using its records to determine "winners" and "losers," and eventually paying out the winners.

163.    While Plaintiff has now discontinued the use of Polymarket while in California, he remains interested in online gambling in California, and if it becomes legal, he will continue to gamble online in California. Plaintiff may be tricked by Polymarket in the future into engaging in unlawful gambling in California if Polymarket continues to claim that its practices are legal.

164.    Plaintiff's sole reason for setting up an account with Polymarket and purportedly consenting to Polymarket's terms of service (which he did not review and was not aware he was purportedly agreeing to at the time of account creation or otherwise) was to gain access to the gambling services in California that he now understands violate California law.

165.    Said differently, to the extent a contract was formed between Plaintiff and Polymarket, the sole purpose of the contract was to facilitate the unlawful gambling activities that are at issue in this Complaint.

166.    Accordingly, Plaintiff's contract with Polymarket (to the extent any such contract was otherwise ever formed), is void (and was void ab initio) pursuant to, among other authorities, California Civil Code Section 1667, which makes contracts invalid where the contract is: "1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; or 3. Otherwise contrary to good morals."

## VII.    CLASS ALLEGATIONS

167.    This action is brought and may properly proceed as a class action pursuant to Federal Rule of Civil Procedure Rule 23, including, without limitation, Sections (b)(1), (b)(2), and (b)(3) of Rule 23.

168.    Plaintiff seeks certification of the following class (the collectively, the "Classes"):

> **The Nationwide Class:** All persons in the United States who lost money or property by making one or more bets on Polymarket.

> **The Statute of Anne Multistate Class:** All residents of Statute of Anne States who lost money or property by making one or more bets on Polymarket.

> **The New York Class:** All residents of New York who lost money or property by making one or more bets on Polymarket.

> **The California Class:** All residents of California who lost money or property by making one or more bets on Polymarket.

169.    The "Statute of Anne States"  means Arkansas (Ark. Code Ann. § 16-118-103), California (CAL. PENAL CODE §§ 319, 330a, 337j), Connecticut (Conn. Gen. Stat. §§ 52-553, 52-554), the District of Columbia (D.C. Code § 16-702), Florida (Fla. Stat. §§ 849.12, 849.26, 849.29), Illinois (720 Ill. Comp. Stat. 5/28-8), Indiana (Ind. Code § 34-16-1), Kentucky (Ky. Rev. Stat. Ann. §§ 372.020, 372.040), Maryland (Md. Code Ann., Crim. Law § 12-110), Massachusetts (Mass. Gen. Laws ch. 137, § 1), Michigan (Mich. Comp. Laws §§ 730.315(1), 600.2939(1)), New Hampshire (N.H. Rev. Stat. Ann. § 338:3), New Jersey (N.J. Stat. Ann. §§ 2A:40-5, -6), New York (N.Y. Gen. Oblig. Law §§ 5-419, 5-421), Ohio (Ohio Rev. Code Ann. § 3763.02), Tennessee (Tenn. Code Ann. § 28-3-106), Vermont (9 Vt. Stat. § 3981), Virginia (Va. Code Ann. §11-15), West Virginia (W. Va. Code § 55-9-2); Alabama (Ala. Code § 8-1-150), Georgia (O.C.G.A. § 13-8-3(b)), Minnesota (Minn. Stat. § 541.02), Mississippi (Miss. Code Ann. § 87-1-5), Missouri (Mo. Rev. Stat. § 434.030 et seq.), Montana (Mont. Code Ann. §§ 23-5-131, 23-5-151), New Mexico (N.M. Stat. Ann. § 44-5-1), Oregon (Or. Rev. Stat. § 30.74), South Carolina (S.C. Code Ann. § 32-1-10), South Dakota (S.D. Codified Laws § 21-6-1), Washington (Wash. Rev. Code § 4.24.070), and Wisconsin (Wis. Stat. § 945.10(4)).

170.    The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action, members of their staffs (including judicial clerks), and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or its parents have a controlling interest, and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel, and non-attorney employees of their firms; and (6) the legal representatives, successors, and assigns of any such excluded persons.

171.    Polymarket's practices have resulted in actual injury and harm to the Class members in the amount of deposits made with Polymarket and/or losses incurred on the Polymarket Platform for bets or wagers placed while in California.

172.    Plaintiff explicitly reserves the right to amend, add to, modify, and/or otherwise change the proposed class definition as discovery in this action progresses.

173.    **Numerosity.** The Class is so large that the joinder of all of its members is impracticable. The exact number of members of the Class can be determined from information in the possession and control of Polymarket.

174.    **Commonality.** Polymarket has acted or refused to act on grounds that apply generally to the Classes. Absent certification of the Classes, the relief sought herein creates the possibility of inconsistent judgments and/or obligations imposed on Polymarket and/or Plaintiffs and the Class. Numerous common issues of fact and law exist, including, without limitation:

    a.    Whether Polymarket violated section 1400-12 of the New York Racing, Pari-Mutuel Wagering and Breeding Law;

    b.    Whether Plaintiffs and each member of the Class lost money or anything of value under New York law;

    c.    Whether Polymarket violated sections 5-419 and -521 of the New York General Obligation;

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

d.   Whether Polymarket violated section 349 of New York's General Business Law;

e.   Whether the representations by Polymarket made about sports betting and/or sports gambling in New York were or are true, or are misleading, or likely to deceive;

f.   Whether Polymarket violates California's laws criminalizing gambling;

g.   Whether Polymarket's representations that its practices are legal are misleading;

h.   Whether Polymarket's conduct violates public policy;

i.   Whether Polymarket engaged in false or misleading advertising;

j.   Whether Polymarket's conduct constitutes violations of the laws asserted herein;

k.   Whether the sports betting contracts are void;

l.   Whether Plaintiff and the other Class members have been injured and the proper measure of their losses as a result of injuries; and

m.   Whether Plaintiff and the other Class members are entitled to injunctive, declaratory, or other equitable relief.

175.   **Predominance.** These common issues predominate over individualized inquiries in this action because Polymarket's liability can be established as to all members of the Class as discussed herein.

176.   **Typicality.** Plaintiff's claims against Polymarket and experience with Polymarket are typical, if not identical, to the claims and experiences of members of the Class because, among other reasons, Plaintiff's claims arise from Polymarket's practices that are applicable to the entire Class.

177.   **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class

actions. Plaintiff's claims are representative of the claims of the other members of the Class, as Plaintiff and each member of the Class lost money to Polymarket. Plaintiff also does not have any interests antagonistic to those of the Class, and Polymarket has no defenses unique to Plaintiff. Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor their counsel have any interest adverse to the Class.

178.    **Superiority.** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that it will provide a realistic means for members of the Class to receive equitable monetary relief; the equitable monetary relief suffered by members of the Class may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Class may be unaware that they have equitable recourse for the conduct alleged herein; and because issues common to members of the Class can be effectively managed in a single proceeding. Plaintiff and their counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

179.    Plaintiff reserves the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## VIII.   CAUSES OF ACTION

**A.    First Cause of Action: Violation of N.Y. Gen. Oblig. Law § 5-419 (on behalf of Plaintiff, the Nationwide Class, and the New York Class)**

180.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

181.    Section 5-419 of the New York General Obligations Law states that, "[a]ny person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be

deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not."

182.    Plaintiff deposited money into accounts created and owned by Defendants for the purpose of engaging in unlawful betting and/or wagering.

183.    Defendants were engaged in an unlawful enterprise wherein consumers paid to participate in unlawful betting and/or wagering.

184.    Upon information and belief, Defendants operated their enterprise out of New York, Defendants processed online consumer payments in New York, and Defendants' user agreements include a New York choice-of-law clause.

185.    Pursuant to § 5-419, Plaintiff, the Nationwide Class, and the New York Class have a right to recover from Defendants the monies deposited as part of Defendants' unlawful betting and/or wagering enterprise.

**B.    Second Cause of Action: Violation of N.Y. Gen. Oblig. Law § 5-421 (on behalf of Plaintiff, the Nationwide Class, and the New York Class)**

186.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

187.    Section 5-421 of the New York General Obligations Law states that, "[e]very person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof."

188.    Within the past three months, Plaintiff deposited at least twenty-five dollars into accounts created and owned by Defendants for the purpose of engaging in unlawful betting and/or wagering.

189.    Plaintiff, the Nationwide Class, and the New York Class lost the money they deposited by engaging in Defendants' unlawful betting and/or wagering games.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

190.    Pursuant to § 5-419, Plaintiff, the Nationwide Class, and the New York Class have a right to recover from Defendants the monies lost to Defendants as part of Defendants' unlawful betting and/or wagering enterprise in the past three calendar months.

**C.    Third Cause of Action: Violation of N.Y. Gen. Bus. Law § 349 (on behalf of Plaintiff, the Nationwide Class, and the New York Class)**

191.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

192.    New York General Business Law section 349 establishes that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

193.    New York General Business Law section 349 applies to Defendants because Defendant engages in consumer conduct by, *inter alia:*

a.    Providing an online platform wherein consumers pay to participate in illegal wagering and betting;

b.    employing individuals in furtherance of their business;

c.    soliciting individuals to become consumers of their product; and

d.    Obtaining consumers' money in furtherance of their business.

194.    Defendants violated section 349 by, *inter alia*, misrepresenting the sports betting games they offer as legal gambling, when Polymarket really offered illegal unlicensed gambling.

195.    Defendants' conduct was material because it was likely to deceive reasonable consumers about the probability of winning their games, the lawfulness of their business and services offered, and whether they were engaged in an addictive behavior.

196.    Defendants willfully misled Plaintiff, the Nationwide Class, and the New York Class and induced them to rely on their misleading statements and/or omissions.

197.    Defendants accepted money from Plaintiff, the Nationwide Class, and the New York Class to participate in unlawful wagering or betting.

198.    Accordingly, Plaintiff, the Nationwide Class, and the New York Class acted reasonably in relying on Defendants' misleading statements and/or omissions, the truth of which they could not have discovered through reasonable investigation.

199.    Defendants acted intentionally, knowingly, maliciously, and recklessly disregarded the rights of Plaintiff, the Nationwide Class, and the New York Class.

200.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff, the Nationwide Class, and the New York Class have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

201.    Plaintiff, the Nationwide Class, and the New York Class seek all monetary and non-monetary relief allowed by law.

**D.    Fourth Cause of Action: Unjust Enrichment (on behalf of Plaintiff and the Classes).**

202.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

203.    Plaintiff and the Classes conferred benefit upon Defendants by paying Defendants to participate in their unlawful betting and wagering scheme.

204.    Defendants appreciated or had knowledge of the benefits they received from Plaintiff and the Classes.

205.    Plaintiff and the Classes reasonably understood that Defendants offered lawful consumer-to-consumer sports betting platform services under New York and other applicable states' laws.

206.     Defendants enriched themselves by saving the costs they reasonably should have expended on complying with regulations and tax requirements for offering betting and wagering services that were not properly advertised or permitted by law.

207.    Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of the benefits conferred.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

208.    Plaintiff and the Classes have no adequate remedy at law.

209.    Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class members—all unlawful or inequitable proceeds that it received because of its misconduct.

**E.    Fifth Cause of Action: Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.,* ("UCL") (on behalf of Plaintiff and the California Class).**

210.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

211.    Polymarket, Plaintiff, and the California Class are "persons" within the meaning of the UCL.

212.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," each of which is separately actionable.

213.    Polymarket's practices of operating a Gambling Website within California are "unlawful" within the meaning of the UCL because, among other things, the operation of a Gambling Website violates California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j because, among other reasons, in the course of business and in the course of trade and commerce, Polymarket's has:

  a.    Operated illegal lotteries and/or games of chance in violation of Penal Code Sections 319, 320, 321, 330a, and 337j by operating a Gambling Website and contests in California.[39]

  b.    Operated banking and/or percentage gambling games in violation of Penal Code Section 330 by operating a Gambling Website and contests in California.

---

[39] Plaintiff alleges in the alternative that the gambling contests offered in California by Polymarket constitute games of "chance' for purposes of those Penal Code Sections that prohibit lotteries and/or other games of chance, and constitute games of skill, to the extent skill is found to be a necessary element of certain claims made under Penal Code Section 337a or otherwise.

c.  Engaged in pool selling in violation of Penal Code Section 337(a)(1) by operating a Gambling Website and contests in California.

d.  Engaged in bookmaking in violation of Penal Code Section 337(a)(1) by operating a Gambling Website and contests in California.

e.  Violated Penal Code Section 337(a)(3) by "receiv[ing], hold[ing], or forward[ing] . . . money . . . staked, pledged, bet or wagered . . upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever" by operating a Gambling Website and contests in California.

f.  Violated Penal Code Section 337(a)(4) by "record[ing], or register[ing] any bet or bets, wager or wagers, upon the result . . . of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever" by operating a Gambling Website and contests in California.

g.  Violated Penal Code Section 337(a)(6) by "[o]ffer[ing] or accept[ing] any bet or bets, or wager or wagers, upon the result . . . of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus" by operating a Gambling Website and contests in California.

214.    Polymarket's operation of the Gambling Website and contests within California is also unlawful within the meaning of the UCL because Polymarket has violated the Consumer Legal Remedies Act (CLRA), as alleged in the Sixth Cause of Action, and violated Penal Code section 496(a), as alleged in the Seventh Cause of Action, below.

215.    Polymarket's operation of a Gambling Website and contests within California is also unlawful within the meaning of the UCL because Polymarket has violated the California Business and Professions Code, because "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

216.    The acts and practices of Polymarket as alleged herein also constitute "unfair" business acts and practices under the UCL because Polymarket's conduct is unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous. Further, the gravity of Polymarket's conduct outweighs any conceivable benefit of such conduct.

217.    Polymarket has, in the course of business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices by tricking consumers into believing operation of a Gambling Website and contests are lawful in California, when in fact, they are not, causing Plaintiff and the Class to be tricked out of significant sums of money.

218.    Plaintiff and the California Class have suffered injury in fact—in the form of all amounts paid to Polymarket and/or the total of net losses on a Gambling Website run by Polymarket for bets placed within California—as a result of Polymarket's unlawful and unfair business acts and practices and are at substantial risk of continuing to lose money and be injured by those acts and practices if the practices are not enjoined.

219.    Plaintiff seeks all available equitable remedies under the UCL. Specifically, Plaintiff and the Class seek an order providing equitable restitution and/or equitable disgorgement in the form of all amounts paid to Polymarket by Plaintiff and the California Class and/or the total of net losses on the Gambling Website by Plaintiffs and the Class for bets placed within California.

220.    Plaintiff further seeks an equitable order enjoining the unlawful practices in California.

221.    Plaintiff and the Class further seek their attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5 because Plaintiff and the Class seek to enforce "an important right affecting the public interest" in bringing this equitable claim.

**F.    Sixth Cause of Action: Violation of California's Consumer Legal Remedies Act, California Civil Code §§ 1750 *et seq.* (on Behalf of Plaintiff and the California Class).**

222.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

223.    At all relevant times, Plaintiff and the California Class members were "consumers" within the meaning of the CLRA, as they were individuals seeking or acquiring, by purchase or lease, goods or services for personal, family, or household purposes.

224.    Polymarket's actions and conduct constituted transactions for the sale or lease of goods or services to consumers under the terms of the CLRA, namely the selling of the unlawful gambling goods and services that are at issue in this action through a Gambling Website.

225.    Polymarket violated the CLRA by, among other things:

    a.    "Misrepresenting the source, sponsorship, approval, or certification of goods or services" (a)(2);

    b.    "Misrepresenting the affiliation, connection, or association with, or certification by, another" (a)(3);

    c.    **"**Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have" (a)(5);

d. "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" (a)(7);

e. "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14);

f. "Representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction" (a)(17); and

g. "Inserting an unconscionable provision in the contract" (a)(19).

h. Polymarket's actions and misrepresentations were material, and Polymarket's violations of the CLRA were a substantial factor in causing Plaintiff and the Class to lose money.

i. As a direct and proximate consequence of these actions, Plaintiff and the Class suffered injury.

226. Polymarket's conduct was malicious, fraudulent, and wanton in that it intentionally and knowingly provided misleading information to Plaintiff and the California Class for Defendants' own benefit to the detriment of Plaintiff and the California Class.

227. The CLRA provides robust enforcement tools for consumers, including:

a. Prohibiting the waiver of any substantive rights provided for under the CLRA. *Id.* § 1750

b. Requiring that the CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." *Id.* § 1760.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

    c.        Establishing a substantive right to litigate in the forum where the transaction occurred and/or where the consumer lives. *Id.* § 1780(d).

    d.        Establishing a substantive right to pursue class claims. *Id.* § 1781; *see also id.* § 1752.

    e.        Authorizing injunctive relief. *Id.* § 1780(a)(2)

    f.        Authorizing actual damages. *Id.* § 1780(a)(1).

    g.        Authorizing restitution of unlawfully taken sums. *Id.* § 1780(a)(3).

    h.        Authorizing punitive damages. *Id.* § 1780(a)(4).

    i.        Authorizing statutory damages of $1,000 per violation. *Id.* § 1780(a)(1).

    j.        Authorizing statutory damages of $5,000 per injured individual, where the unlawful conduct was directed against the elderly or the disabled. *Id.* § 1780(b)(1).

    k.        Requiring that the Court "shall award court costs and attorney's fees to a prevailing plaintiff in litigation." *Id.* § 1780(e).

228.    Plaintiff seeks all available remedies under the CLRA, except that, at this time, Plaintiff does not seek any monetary damages for his CLRA cause of action.[40]

### G.    Seventh Cause of Action: Violation of Penal Code section 496(c) (on Behalf of Plaintiff and the California Class).

229.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

230.    As alleged above, Polymarket's advertisements induced Plaintiff to wager significant amounts of money via the Gambling Websites on the false pretense that Defendants'

---

[40] Pursuant to Section 1782(d) of the CLRA, Plaintiff expressly reserves his right to amend the CLRA cause of action to add claims for monetary relief, including, without limitation, for actual, punitive, and statutory damages, at least 30 days after providing Defendants the notice contemplated by Section 1782(a).

sports betting platform was legal in California. Defendants' purpose in making these false pretenses was to illegally take money from Plaintiff and the California Class.

231.    Pursuant to California Penal Code section 496(a) receiving property "that has been obtained in any manner constituting theft" is a criminal offense punishable by imprisonment. Pursuant to California law, procuring funds by false pretenses constitutes a violation of Section 496(a). Pursuant to Section 496(c), any person that violates Section 496(a) is liable for three times the actual damages as well as attorney's fees.

232.    Defendants' conduct alleged above constitutes a violation of Penal Code section 496(a) entitling Plaintiff to the relief provided by Section 496(c) including treble damages and reasonable attorney's fees.

> **H.    Eighth Cause of Action: Violation of Cal. Civ. Code § 22.2 and the Statute of Anne (on Behalf of Plaintiff and the California Class).**

233.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

234.    Like many U.S. states, in the early days of statehood, California looked to the English common law as a model for its state law.

235.    On April 13, 1850, California passed an "Act adopting the Common Law," which read: "The Common Law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of the State of California, shall be the rule of decision in all Courts of this State."

236.    Since 1850, California continues to maintain the Act, and it is currently codified at Cal. Civ. Code § 22.2. Cal. Civ. Code § 22.2 currently provides: "The common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this State, is the rule of decision in all courts of this State." Courts have determined that when California imported the English common law that California imported not only the "whole" "body of judge-made" decision law of the English courts, but "also the written

statutes enacted by Parliament." *Tak Chun Gaming Promotion Co. Ltd. v. Long*, 314 Cal. Rptr. 3d 890, 895 (2023*), as modified on denial of reh'g* (Nov. 17, 2023) (cleaned up).

237.    One of the statutes of Parliament that was effective in 1850 (and therefore incorporated into California law) was the Gaming Act of 1710, commonly referred to as the "Statute of Anne." Section II of the Gaming Act of 1710 reads as follows:

> And be it further enacted by the Authority aforesaid, That from and after the said first Day of May one thousand seven hundred and eleven, any Person or Persons whatsoever, who shall at any Time or Sitting, by playing at Cards, Dice, Tables, or other Game or Games whatsoever, or by betting on the Sides or Hands of such as do play at any of the Games aforesaid, lose to any one or more Person or Persons of playing or betting in the whole, the Sum or Value of ten Pounds, and shall pay or deliver the same or any Part thereof, the Person or Persons, so losing and paying or delivering the same, shall be at Liberty within three Months then next, to sue for and recover the Money or Goods so lost, and paid or delivered or any Part thereof, from the respective Winner and Winners thereof, with Costs of Suit, by Action of Debt founded on this Act, to be prosecuted in any of her Majesty's Courts of Record, in which Actions or Suits no Effoin, Protection, Wager or Law, Privilege of Parliament, or more than one Imparlance shall be allowed; in which Action it shall be sufficient for the Plaintiff to allege, that the Defendant or Defendants are indebted to the Plaintiff, or received for the Plaintiff's Use, the Money so lost and paid, or converted the Goods won of the Plaintiff to the Defendant's Use, whereby the Plaintiff's Action accrued to him, according to the Form of this Statute, without setting forth the Special Matter; and in café the Person or Persons who shall lose such Money or other Thing aforesaid, shall not within the Time aforesaid, really and bona fide, and without Covin or Collusion, sue, and with Effect prosecute for the Money or other Thing, so by him or them lost, and paid or delivered as aforesaid, it shall and may be lawful to and for any Person or Persons, by such Action or Suit aforesaid, to sue for and recover the same, and treble the Value thereof, with Costs of Suit, against such Winner or Winners as aforesaid; the one Moiety thereof to the Use of the Person or Persons that will sue for the same, and the other Moiety to the use of the Poor of the Prish where the Offense shall be committed.

238.    Within the meaning of the Statute of Anne and by extension Cal. Civ. Code § 22.2, Polymarket is the "winner," as they received all or part of the money lost by Plaintiff and the Class Members using Defendants' gambling services.

239.    Within the meaning of the Statute of Anne and by extension Cal. Civ. Code § 22.2, Plaintiff is a "Person," as he lost money to Defendants using their gambling services.  Defendants received all or part of the money Plaintiff lost to Defendants. Plaintiff has not colluded with any other individuals in bringing this action.

240.    Plaintiff and the Class Members all lost more than "ten Pounds" during the "playing or betting in the whole, the Sum of Value" within "three Months" as provided within the meaning of Cal. Civ. Code § 22.2, and by extension the Statute of Anne.

## IX.    JURY TRIAL DEMAND

241.    Plaintiff, on behalf of himself and the Classes, including each subclass, demands a trial by jury on all causes of action for which a jury trial is available.

## X.    PRAYER FOR RELIEF

242.    Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter an Order:

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

A.      Certifying the proposed Class pursuant to Rule 23, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.      Awarding damages, including nominal, punitive, consequential, and all other damages that the Court may deem appropriate;

C.      Awarding equitable relief, including injunctive relief and monetary relief such as equitable restitution and/or equitable disgorgement;

D.      Providing for any and all other relief the Court deems appropriate;

E.      Awarding Plaintiff his reasonable costs and expenses of suit, including all attorneys' fees available under the relevant laws;

F.      Awarding pre- and post-judgement interest on any equitable monetary recovery to extent allowed at equity; and

G.      Providing such further equitable relief as this Court may deem just and proper.


 Respectfully submitted,


Dated: February 11, 2026

                                        By: /s/ James Bilsborrow
                                        James Bilsborrow (SDNY# JB8204)
                                        Aaron Freedman NY Bar No. 6015036
                                        **WEITZ & LUXENBERG PC**
                                        700 Broadway
                                        New York, NY 10003
                                        Telephone: 212-344-5461
                                        E-mail: jbilsborrow@weitzlux.com
                                        E-mail: afreedman@weitzlux.com

                                        Michael Piggins, *pro hac vice* to be filed
                                        **WEITZ & LUXENBERG PC**
                                        3011 W. Grand Blvd., Fl. 24
                                        Detroit, MI 48202
                                        Telephone: 231-366-3108
                                        E-mail: mpiggins@weitzlux.com

                                        Margot P. Cutter, *pro hac vice* to be filed
                                        Charles B. Stevens, *pro hac vice* to be filed
                                        **CUTTER LAW, P.C.**
                                        401 Watt Ave.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Sacramento, CA 95864
(916) 290-9400
Email: mcutter@cutterlaw.com
Email: cstevens@cutterlaw.com

Wesley M. Griffith, *pro hac vice* to be filed
**ALMEIDA LAW GROUP LLC**
111 W. Ocean Blvd, Suite 426
Long Beach, CA 90802
Telephone: 310-896-5813
E-mail: wes@almeidalawgroup.com

David A. McGee, *pro hac vice* to be filed
**ALMEIDA LAW GROUP LLC**
3133 Connecticut Ave Nw.
Washington, DC 20008
Telephone: 202-913-5681
E-mail: dmcgee@almeidalawgroup.com

F. Peter Silva II, *pro hac vice* to be filed
**TYCKO & ZAVAREEI LLP**
333 H Street, Suite 5000
Chula Vista, CA 91911
Telephone: 510-588-5299
E-mail: psilva@tzlegal.com

Katherine M. Aizpuru, NY Bar No. 5305990
Robert M. Devling, *pro hac vice* to be filed
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, NW, Suite 1010
Washington, District of Columbia 20006
Telephone: 202-973-0900
E-mail: kaizpuru@tzlegal.com
E-mail: rdevling@tzlegal.com

Christopher Nienhaus, *pro hac vice* to be filed
**ALMEIDA LAW GROUP LLC**
849 W. Webster Ave
Chicago, IL 60614
Telephone: 708-529-5418
E-mail: chris@almeidalawgroup.com

*Counsel for Plaintiff and the Proposed Classes*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL